# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| FABIO TOMAZ, JHONATHAN DIAS, MARINA SANTOS ALMEIDA, RICARDO COSTA, LUIZ SILVA, GABRIEL PELEGRIM, WILLIAM LUZIANO, CARLOS VIERA, DEMILSA SILVA, PEDRO QUINTELA, BRUNA REZENDE, RODRIGO QUIESA, and LUCIANO CASSEMIRO,<br><br>Plaintiffs,<br><br>v.<br><br>MAX ULTIMATE FOOD, INC. and NEAL BALKOWICH,<br><br>Defendants. | Civil Action No. 1:19-cv-10533-RGS<br><br>**REQUEST FOR ORAL ARGUMENT** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure for the United States District Court of Massachusetts and Local Rule 7.1, now come Defendants Max Ultimate Food, Inc. ("MAX" or the "Company") and Neal Balkowitsch ("Defendant Balkowitsch")[1] (collectively "Defendants") and submit the following memorandum of law in support of their Motion for Summary Judgment.

**I.     SUMMARY OF ARGUMENT**

Plaintiff Fabio Tomaz ("Plaintiff" or "Tomaz"), the only remaining Plaintiff in the case, claims that he was incorrectly classified as an exempt employee and is thus owed overtime. This claim fails as Tomaz was exempt from overtime pursuant to the Executive Exemption under both

---

[1]     Defendant Balkowitsch's last name is misspelled in the Complaint.

1

state and federal law.  Specifically, MAX was a highly regarded catering company that catered large and small events in New England.  Plaintiff was an exempt Head Chef at events making $80,000 per year, $70,000 of which was guaranteed salary, who was charged with running the Kitchen (e.g., the "back of the house") at events he worked.  While managing the Kitchen at an event, he admits he supervised all employees in the Kitchen and ensured that the food served at the events – which of course was the primary reason MAX was a successful caterer – was served at a quality, taste and aesthetic worthy of MAX's reputation.

Plaintiff's claim appears to stem from the confusion that (1) he was paid on a "salary plus" basis, meaning that in addition to his hefty salary, he received additional pay at an hourly rate for working events and now wants time and a half that hourly rate for overtime; and (2) like other exempt employees, he did undoubtedly perform some non-exempt work, such as cooking prior to events and painting (while supervising others doing maintenance).  There is a dispute over many of the activities Plaintiff was performing when not acting as Head Chef of an event; in reality Plaintiff was a high-level employee who also was second in the chain of command in the Company Kitchen (the "Commissary") tasked to prepare food for events prior to the event and overall was a high-level employee given broad discretion to help operate the Company, yet Plaintiff testified his work outside of events was mostly cooking and supervising maintenance.  The disputed parts of Plaintiff's job outside of the events are, for purposes of this motion, irrelevant.  Rather, it is undisputed that the Defendants valued Tomaz's management of the back of the house during events the most out of anything he did.   Thus, under the executive exemption, the rest of his job does not matter.

Plaintiff's two other counts can also be dismissed. Plaintiff claims he was not timely paid wages, but fails to point to any evidence of this and, to the contrary, Plaintiff's paystubs show he

2

was timely paid.  Finally, Plaintiff claims he was not allotted sick time under M.G.L. c. 149 § 148C in 2018.  However, Plaintiff admitted in his deposition that he was paid for any absence due to sickness and Plaintiff's paystubs show that he was paid not only his 3 weeks' vacation and 40 hours of sick time, but was overpaid an additional week and half of pay.  Thus, Plaintiff's claims should be dismissed in the entirety.

## II.     FACTS

### Defendants

MAX was a full-service off-site catering company serving the Greater New England area that catered a variety of events, from large events with hundreds of people in hotels or banquet facilities to more upscale, intimate events.  Statement of Undisputed Facts ("SUF"), ¶1.  From March of 2016 through the end of 2018 (the "Relevant Period"), the *only* thing MAX did was cater events.  SUF, ¶2.  It did not operate a restaurant or other facility that served customers at its facility or provide take out or delivery to customers.  SUF, ¶3.  For this obvious reason, event operations were absolutely critical.  SUF, ¶4. On a given week, MAX catered numerous events and on some nights might cater more than one event.  SUF, ¶5.  At each event an employee would be appointed "Head Chef."  SUF, ¶6.  The Head Chef would be in charge of the Kitchen during the event and all of the employees in the Kitchen, including other chefs and employees necessary to make the operation run.  SUF, ¶7.  The ultimate responsibility for quality, safe, visually pleasing, tasty food in line with the client's selections fell on the Head Chef at the event.  SUF, ¶8.  Thus, the role of the Head Chef at events was absolutely critical given that the primary reason MAX was hired to cater events was its excellent food.  SUF, ¶9.

Defendant Balkowitsch was one of the owners of MAX.  SUF, ¶11.  During the Relevant Period, MAX employed approximately thirty (30) regular employees and approximately 400

3

Case 1:19-cv-10533-RGS Document 24 Filed 07/20/20 Page 4 of 17

employees were on-call or recruited for events (e.g., were not regular employees). SUF, ¶¶12-13. Towards the end of 2018, MAX sold its assets and ceased operating. SUF, ¶ 14. The Complaint in this matter was filed on March 21, 2019. SUF, ¶15. Given the statute of limitation for Massachusetts overtime and sick time violations is three years and Fair Labor Standards Act ("FLSA") overtime violations is two years (three years if willful), the Relevant Period starts to run on March 21, 2016.[2] 29 U.S.C.A. § 255; M.G.L.A. 151 § 20A.

### Plaintiff's Employment

Plaintiff first became employed by MAX in June 2003. SUF, ¶16. For approximately the first five months of the Relevant Period, Plaintiff made an annualized salary of $60,000/year ($1,346.15 per week), which was increased on August 14, 2016, less than five months into the Relevant Period, to $70,000/year ($2,692.30 per week). SUF, ¶¶17 – 18. MAX management gave Plaintiff the title of "Executive Sous Chef," which was memorialized in his signature block. SUF, ¶¶19-20. No one else at MAX had this title in their email signature or otherwise. SUF, ¶21.

Plaintiff's salary was *never* subject to reduction and in every week, without exception he was paid his salary. SUF, ¶22. Given the importance of the actual work performed at events, Plaintiff was also paid $35.00 per hour for working events. SUF, ¶23. He also received tips from customers, received reimbursement for mileage, hotel stays (if the event was far enough away) and free meals. SUF, ¶24. Exclusive of nontaxable tips, for the years 2016, 2017, and 2018, Plaintiff earned $78,548.38, $87,155.45, and $81,940, respectively, in wages. SUF, ¶¶25-27.

---

[2] To the extent the Complaint alleges any issues prior to 2016, the Defendants also move for summary judgment as to those allegations.

4

Plaintiff testified the Head Chef at events was in charge of the "head of the back of the house" (e.g., the "Kitchen"). SUF, ¶¶32 – 36, 38. Job duties of the Head Chef included directing chefs in finalizing and preparing the food, directing chefs as to how long to cook the food, directing chefs as to what instruments, pans and other equipment to use in preparing the food, directing chefs in plating the food, including showing the chefs how the food was to be plated, and directing chefs in packing the food. SUF, ¶¶32 – 38. In this role, he supervised all the chefs working. SUF, ¶¶32 – 38, 44. He also recommended the hiring of various individuals to MAX and MAX gave those recommendations great weight, hiring the individuals recommended by MAX. SUF, ¶¶55 – 62.

### III.  LEGAL ARGUMENT

#### A.  Summary Judgment Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant [...] would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F .2d 5, 8 (1st Cir. 1990). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

### B.     Plaintiff was an Exempt Employee Under the Executive Exemption

Unless an employee is exempt, the FLSA and Mass. Gen. Laws ch. 151, § 1A require employers to pay their employees at least "one and one-half times the regular rate" at which they are employed for any hours worked in excess of a forty-hour workweek. 29 U.S.C. § 207(a)(1). One exemption is where the employee, like Plaintiff here, is "employed in a bona fide executive […] capacity." 29 U.S.C. § 213(a)(1) ("Executive Exemption").

> During the Relevant Period, the FLSA's Executive Exemption applied to any employee:
>
> "(1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $455$^3$ per week […] exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

29 C.F.R. § 541.100. Massachusetts overtime provisions are identical to the federal law in this respect, and thus the Massachusetts law will not be discussed individually. *See Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999); *Goodrow v. Lane Bryant, Inc.*, 432 Mass. 165, 732 N.E.2d 289, 294 (2000).

---

[3] The Secretary of Labor adopted revised FLSA regulations effective January 1, 2020 increasing the minimum salary to $684 per week, which do not apply retroactively. Obviously, Plaintiff's salary is well beyond those new standards as well.

> 1. *Plaintiff was Compensated on a Salary Basis at a Rate of Not Less Than $455 per Week.*

As noted in the facts, Plaintiff's guaranteed base salary started at $60,000 in the relevant period and after a few months increased to $70,000, ***almost three times the required minimum salary basis.*** SUF, ¶¶17 – 18. Plaintiff clearly testified that there was never a deduction from his guaranteed salary ("Q: And it's true you always received your salary regardless of how much you worked that week, correct? A: Yes. … Q: So, even if MAX was closed or you left early, or there wasn't work to be done, your salary would not be reduced, correct? Yes."). SUF, ¶ 28. He was paid his ***very*** generous salary despite variations in the quality or quantity of the work he performed. SUF, ¶¶22, 28 – 31. Plaintiff admits that there were many days he was not scheduled to work, which did not decrease his salary. SUF, ¶ 29. Plaintiff admits there were days he was sick, which he took off despite being scheduled, with no decrease to his salary. SUF, ¶30. In addition, he took off other scheduled days due to a vacation or just as a "day off." SUF, ¶31. In absolutely every week, without exception, Plaintiff was paid his salary. SUF, ¶22.

In addition to this rate, MAX paid Plaintiff an additional amount of $35.00 per hour at events. SUF, ¶23. This additional amount paid does not in any way impact an employee's exempt status. The FLSA regulations state that:

> An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis. … [For example], the exemption is not lost if an exempt employee who is guaranteed at least $913 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis) …

29 C.F.R. § 541.604.  The additional rate on top of a salary is clearly permissible under the FLSA.  The "salary plus" model recognized in the regulations is also specifically recognized in our jurisdiction.  *See Guardia v. Clinical & Support Options, Inc.,* 25 F.Supp.3d 152 (D. Mass. 2014).

> 2.  *Plaintiff's Primary Duty Was Management of a Customarily Recognized Subdivision.*
>
> (a)  **As Head Chef, Plaintiff was a Manager.**

Plaintiff undisputedly managed MAX's Kitchen/back of the house when he was Head Chef at an event.  Per regulations promulgated by the U.S. Department of Labor governing the Executive Exemption, some examples of "management" include, but are not limited to, "interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; […] planning the work; determining the techniques to be used; […] determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; […] providing for the safety and security of the employees or the property […]." 29 C.F.R. § 541.102.

Plaintiff testified that:

> Q: "What's the difference between being the chef and a head chef".
>
> A: "The head chef of the event would talk to the manager [of the front of the house at the event] to find out what time and how the food would be presented and the time. The head chef would come – if the party is a big party, would have some more chefs work with them and then it would be explained to everyone what's the --- so they would explain the way to do the work
>
> Q: So, if you were the head chef, would you tell the other chefs how long to cook the food?
>
> A: Yes.
>
> Q: Would you tell them how to place the food?

> A: Yes.
>
> Q: Would you tell them what instruments, pans and other equipment to use?
>
> A: Yes. Working an event, if you were head chef, you would be putting the food together and showing all chefs how the plates is going to be presented, and also, you would be responsible to pack the food.

SUF, ¶32. Expounding upon this idea, Tomaz testified that the Head Chef at the event would tell the other workers in the back of the house what to use, inform those in the Kitchen of any allergies, and explain to the back of the house workers how everything is made. SUF, ¶33. Tomaz also testified that the Head Chef of an event – including when he was Head Chef – would pack the food for the event or, if the party was big, instruct another employee to pack the food in advance of the event at the Commissary. SUF, ¶34. In addition, he testified, if someone was not practicing food safety in the Kitchen at an event, he would tell them how to do the task. SUF, ¶35. (38). He further testified:

> Q: Okay. And when you're a head chef, would you be the one responsible for the food actually turning out well?
>
> A: Yes.
>
> Q: Okay. Was there ever a time you had to have somebody redo what they had cooked because it wasn't up to standard?
>
> A: Sometimes.
>
> Q: And when you were the head chef, would you look at the food before it goes out to make sure it was good?
>
> A: Yes.

SUF, ¶36. In addition, MAX's chefs and cooks at events viewed Plaintiff as their supervisor when he was Head Chef. SUF, ¶44. For the reasons set forth above, Plaintiff's primary duty was <u>management</u> of MAX's Kitchen/back of the house at events when he was the Head Chef.

      **(b)**     **MAX's Kitchen or "Back of the House" Was Customarily Recognized by MAX as a Distinct Subdivision of its Catering Department.**

The Executive Exemption's second element mandates that the employee's primary duty must consist of managing a customarily recognized department or subdivision thereof. Per 29 C.F.R. § 541.103(a), the phrase "a customarily recognized department or subdivision" is intended to distinguish between "a mere collection of employees assigned from time to time to a specific job or series of jobs" from "a unit with permanent status and function." Here, Plaintiff ran the "back of the house" (Kitchen) at events he worked as the Head Chef, as he admitted in his deposition. SUF, ¶7. ("The head chef at the events, he's the head of the back of the house."). The MAX chefs and cooks who worked in the Kitchen/back of the house worked independently from employees in MAX's "front of the house" where MAX's guests and clients dined. SUF, ¶ 39. The Head Chef at the event would supervise Kitchen workers and had overall responsibility of the smooth operation of the meal preparation, the General Manager would oversee the "front of the house," meaning deal with the client interfacing, waitstaff and other employees who interacted with the guests. SUF, ¶40.

The fact that the location of events changed does not matter, because the recognized department or subdivision "need not be physically within the employer's establishment and may move from place to place." 29 C.F.R. § 541.103(c). Along the same lines, the mere fact that Plaintiff "worked in more than one location" when it came to events "does not invalidate the exemption if other factors show that the employee is actually in charge of a recognized unit with a continuing function in the organization." *Id*. Finally, that the chefs and cooks Plaintiff directed the work of varied from event to event (although many events had some of the same workers) is also of no consequence because "[c]ontinuity of the same subordinate personnel is

10

not essential to the existence of a recognized unit with a continuing function." 29 C.F.R. § 541.103(d). *See, e.g., Scherer v. Compass Group USA, Inc.*, 340 F.Supp.2d 942, 950-952 (W.D. Wis. 2004) (holding that food service operator's kitchen or "back of the house" was recognized by operator as a distinct subdivision of the catering department where kitchen staff worked independently from employees in the front of the house, kitchen staff remained constant and were not rotated, and immediate supervision of the front of the house and immediate supervision of the kitchen and food production were conducted by different persons.); *Coberly v. Christus Health*, 829 F.Supp.2d 521, 529 (2011) (finding that a healthcare provider's kitchen was a department within the provider's dining services.)

### (c)  Plaintiff's Head Chef Work At Events was his "Primary Duty"

Plaintiff's work as a Head Chef of events was also his <u>primary duty.</u>  According to the FLSA regulations:

> To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700.  As repeatedly indicated, the responsibility of the Head Chef at events was crucial to the Company.  SUF, ¶9.

Plaintiff is expected to dispute that his work as "Head Chef" at events was his primary duty.  Rather, he complains that he spent a significant amount of time preparing and cooking

11

food prior to an event at the Commissary, which is where the Company Kitchen was, and normally supervised by Head Chef Matthew Donegan (who generally did not work events). SUF, ¶¶41 – 42. In addition, he complains that for several months he would also oversee some painting and construction work, although his testimony was that he did have several workers helping him do the painting and he would tell those workers what to do, which still would be exempt duties completely in-line with the executive exemption. SUF, ¶¶45 – 46. Plaintiff's work outside events is highly disputed; in reality Plaintiff was a high-level employee who oversaw hors d'oeuvres preparation at the Commissary (outside events), approved/fixed time cards, created menus, trained chefs, and more. Those disputed duties will be disregarded for purposes of this motion. It is not disputed, however, that in connection with his other work, Tomaz had the keys to access the mail room, liquor room, and recycle oil bin at the Commissary and had a company credit card. SUF ¶47. During the years 2017 and 2018, Plaintiff made purchases on his MAX credit card totaling $28,140.35 and $93,602.38 respectively. SUF, ¶48.

During the Relevant Period, Plaintiff worked at 232 events that were catered by MAX. SUF, ¶50. Of these 232 events, Plaintiff worked as "Head Chef" at 200 of them. SUF, ¶51. This is not insignificant in any fashion. Further, "[t]ime alone is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700.

However, even taking Plaintiff's story as true that outside of being the Head Chef at events, and outside the several months where he oversaw maintenance work, he performed many hours cooking food in preparation of events, the exemption stands because his work as Head

12

Chef at events, was still the most important thing he did. SUF ¶¶4, 9. Plaintiff would be hard pressed to say that his work cooking outside of events was the most important thing he did.

Moreover, the fact that Plaintiff earned nearly twice the amount that the chefs and cooks he directed earned is also indicative of the fact that he managed them and their activities. SUF, ¶¶17 – 18, 54. The other chefs and cooks who cooked at the Commissary and never or rarely functioned as Head Chefs would make only $12.00 per hour to $25.00 per hour for work they performed at MAX's commissary and $17.00 per hour and $26.00 per hour to work events. SUF, ¶54.

      3. *Plaintiff Customarily and Regularly Directed the Work of Two or More Other employees*

As explained above, Plaintiff customarily and regularly directed the work of far more than two chefs in the Kitchen/back of the house. At any given time, Plaintiff directed, supervised, and managed a total of twenty (20) to forty (40) chefs at events. SUF, ¶43. For these reasons and the reasons discussed above, Plaintiff customarily and regularly directed the work of two or more other employees thereby satisfying this element of the Executive Exemption. *See Velazquez-Fernandez v. NCE Foods, Inc.* 476 F.3d 6, 13-14 (1st Cir. 2007) (warehouse manager held to fall under Executive Exemption where manager supervised anywhere from six (6) to nine (9) workers); *Murphy v. Town of Natick*, 516 F.Supp.2d 153, 159 (D. Mass. 2007) (Sergeants who directed nine (9) to ten (10) patrol officers fell under the Executive Exemption); *See Graceffa v. Mary Stokes Waller et al.*, 2017 WL 1103426, at *3 (Stable manager who planned and directed the work of fourteen (14) people during his time as stable manager held to have customarily and regularly directed the work of two or more other employees.) In connection with his Head Chef duties at events relating to this element, Plaintiff testified:

- He would tell the chefs he directed how long to cook the food. SUF, ¶32.
- He would tell the chefs he directed how to plate the food. SUF, ¶37.
- He would tell the chefs he directed what instruments, pans and other equipment to use. SUF, ¶37.
- He would put the food together and show all the other chefs how the plates would be presented. SUF, ¶37.
- If the party was big, he would instruct another employee to pack the food in advance of the event. SUF, ¶ 34.
- If someone was not practicing food safety at an event, he would tell them how to do the task. SUF, ¶ 35.
- If the food another chef prepared was not to standard, he would have to tell the chef to re-do the food. SUF, ¶ 36.

Thus, it is clear Plaintiff supervised two or more employees.

> 4. *Plaintiff had the authority to hire other employees and his suggestions and recommendations as to the hiring of other employees was given particular weight by MAX.*

The Executive Exemption's final element mandates that the employee must have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees be given particular weight. MAX's business was a little different given that they were unlikely to "fire" people working events, but rather simply not call them to work at the next event. SUF, ¶63. However, Plaintiff's recommendations as to hiring other employees was given particular weight by MAX. SUF, ¶¶55 – 62. In fact, management frequently hired employees Plaintiff recommended. SUF, ¶¶55 – 62. Plaintiff himself admits:

- Plaintiff recommended hiring Tiago Uzai and Luiz Contanto. SUF, ¶55.

- Recommending hiring staff for large scale events. SUF, ¶57.

- When staffing large events, he testified that sometimes he would remember working with someone and recommend the company hire that person. SUF, ¶58.

- Recommending hiring staff in busy seasons. SUF, ¶62.

- He asked workers at MAX if they had any friends that wanted to work at an event. SUF, ¶66.

- He brought two employees ("Gabe" and "Jonathan") in to MAX and when he felt that they were not being paid correctly, it did not feel great "to have people that we introduce to have them working and they are not happy." SUF, ¶67.

MAX hired many individuals Tomaz recommended for large events, busy seasons and prep cooks. Plaintiff also testified he translated applications and submitted them to MAX. While he tried to testify these were not "recommendations," in reality the owners took applications he submitted as being his recruitment of people and hired them upon his submission. SUF, ¶¶60 – 61.  Management discussed the performance of other chefs with Tomaz and took this into account when re-hiring chefs for events.  SUF, ¶65.  MAX hired many individuals Tomaz recommended for large events, busy seasons and prep cooks.  SUF, ¶62.

Accordingly, each of the four elements of the Executive Exemption have been satisfied and Plaintiff is thereby exempt.

## IV. REMAINING CLAIMS

As Plaintiff's paystubs show, he was always timely paid his salary and additional incentive compensation relating to event work.  SUF, ¶¶72 – 73.  Thus, the only remaining claim relates to sick time.

Plaintiff complains he was supposed to be given three (3) weeks of vacation and that sick time was deducted from his vacation time.  In reality, Plaintiff was overpaid for his time off.

15

Most office employees were only provided two (2) weeks of vacation plus the forty (40) hours of sick time, which accrued according to the Massachusetts sick law.  SUF, ¶68.  However, due to his high position Plaintiff was given 3 weeks of vacation.  SUF, ¶69.  Plaintiff claims that in 2018 he had his vacation improperly deducted for sick time and/or he was late paid vacation.  At the beginning of 2018, he started with the correct 3 weeks of vacation time and started accruing 40 hours of sick time.  SUF, ¶76.  The confusion over his vacation versus sick time likely stems from the sick accrual was put into the vacation bank on his paystub (with the note that vacation was only for 120 hours) and sick time was listed as "vacation" for subtraction purposes as well.  In reality, plaintiff took at minimum – based upon his own records – more than 4 weeks of paid time.  SUF, ¶77.  He was then paid 78.77 hours upon separation of employment, as apparently the sick time accrual was never capped and continued to accrue time.  SUF, ¶78.

## V.   CONCLUSION

As explained in detail above, Plaintiff is not entitled to overtime compensation as a matter of law because he was exempt.  In addition, he was properly paid all his wages and was given sick time pursuant to the Massachusetts statute.  Therefore, Defendants respectfully request that this Honorable Court enter judgment in their favor with regards to Plaintiff's entire complaint.

                MAX ULTIMATE FOOD, INC. and
                NEAL BALKOWITSCH

                By Their Attorneys,

                PARTRIDGE SNOW & HAHN LLP

                /s/ Alicia J. Samolis
                Alicia J. Samolis (#663415)
                40 Westminster Street, Suite 1100
                Providence, RI  02903-7120
                asamolis@psh.com
                (401) 861-8200
                (401) 861-8210 FAX
                asamolis@psh.com

DATED:  July 17, 2020

## CERTIFICATE OF SERVICE

       I hereby certify that on the 17th day of July, 2020, I caused a true copy of the foregoing document to be served via electronic mail upon the following counsel as follows:

                David B. Summer
                Law Office of David B. Summer
                100 State Street, Suite 900
                Boston, MA 02109

                /s/ Alicia J. Samolis

3874716.1/13937-5