UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-10533-RGS

FABIO TOMAZ, JONATHAN DIAS,
MARINA SANTOS ALMEIDA, RICARDO COSTA,
LUIZ SILVA, GABRIEL PELEGRIM, WILLIAM LUZIANO,
CARLOS VIERA, DEMILSA SILVA, PEDRO QUINTELA,
BRUNA REZENDE, RODRIGO QUIESA,
and LUCIANO CASSEMIRO

v.

MAX ULTIMATE FOOD, INC.
and NEAL BALKOWICH

MEMORANDUM AND ORDER ON PLAINTIFF FABIO TOMAZ'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT

September 14, 2020

STEARNS, D.J.

Fabio Tomaz worked for MAX Ultimate Food, Inc. (MAX), from June of 2003, until he was fired in December of 2018.[1]  MAX is a Boston-based catering company serving the Greater New England area.  Tomaz performed cooking and catering services for MAX at its Boston Commissary and at off-site catering events.

---

[1] All the named plaintiffs except Tomaz executed a settlement agreement with MAX and Neal Balkowitsch, its president. The court notes that Balkowitsch's name is misspelled in the Complaint.

The Complaint alleges violations of the federal Fair Labor Standards Act (FLSA) (Count I); Mass. Gen. Laws ch. 149, §§ 148-150 (The Wage Law) (Count II); Mass. Gen. Laws ch. 151 § 1A (Earned Overtime) (Count III); and Mass. Gen. Laws ch. 149 § 148C (Earned Sick Time) (Count IV).  The Counts present allegations of unpaid overtime and miscalculated vacation and sick days.  Tomaz moves for summary judgment on Count II, claiming that he was untimely paid for his unused vacation days, and on Count IV, claiming that MAX erroneously deducted hours from his vacation time when he missed work because of an injury.  MAX cross-moves on all Counts, asserting innocent computational errors with respect to the accounting of the vacation and sick pay owed to Tomaz, and that because Tomaz falls within the federal and Massachusetts "executive exemption" he is not entitled to overtime or other supplemental pay.  Tomaz's motion will be denied, and MAX's cross-motion will be denied in part and allowed in part.

## BACKGROUND

Tomaz worked at MAX on average six days a week preparing food distributed from MAX's Commissary or served at catered events.  At the time he was fired, he was earning an annual salary of $70,000, plus an additional $35.00 an hour (and tips) for his catering work.  The gist of Tomaz's

Complaint is that MAX improperly classified him as a salaried employee to avoid paying him for his overtime hours.

Whatever his proper classification, Tomaz was entitled to 120 hours of paid vacation (three weeks) and forty hours of paid sick time each year.  In September of 2018, Tomaz took eight sick days because of an injury.  He claims that some (or all) of this time was improperly deducted from his vacation time.  In February of 2019, Tomaz received a final check from MAX for 78.77 hours of purported vacation time.  Much ink has been spilled over how that number was calculated.

STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008).  The standard does not change on cross-motions – the court assesses each motion separately, viewing the facts in the light most favorable to each non-moving party in turn and drawing all reasonable inferences in favor of that non-moving party.  *Giguere v. Port Res. Inc.*, 927 F.3d 43, 47 (1st Cir. 2019).  "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose

between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

DISCUSSION

I.     Plaintiff's Motion on Counts II and IV

    a. Count II

The Wage Act requires that "any employee discharged from . . . employment shall be paid in full on the day of his discharge . . . ." Mass. Gen. Laws ch. 149, § 148. "This provision 'impose[s] strict liability on employers,' who must 'suffer the consequences' of non-compliance regardless of their intent." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018), quoting *Dixon v. City of Malden*, 464 Mass. 446, 452 (2013). The Act has a draconian aspect: "An employee who does not receive [his] due wages by [the day of discharge] — even an employee who is paid in full a day later — suffers a cognizable injury within the purview of the statute." *Lawless*, 894 F.3d at 22 (holding an employer liable where it issued an electronic transfer of funds to plaintiff's bank account knowing plaintiff would not receive the funds until the next day after his discharge). "Wages" under the Act include "any holiday or vacation payments due an employee under an oral or written agreement." Mass. Gen. Laws ch. 149, § 148; *see also Elec.*

4

*Data Sys. Corp. v. Attorney Gen.*, 454 Mass. 63, 69 (2009) (emphasizing that all earnings due must be "paid in full on the day of his discharge.").

It is undisputed that Tomaz received a check for 78.77 hours of what was designated vacation time forty days after the date of his termination. The issue is whether those 78.77 hours in fact represent "unused vacation time to which [he was] entitled." *See Dixon*, 464 Mass. at 452. According to Balkowitsch, Tomaz should not have been paid at all: "Tomaz was . . . erroneously paid 78.77 hours upon termination, as the sick time accrual was never capped and continued to accrue time, providing him a total of 220 hours rather than 120 hours of vacation and 40 hours of sick time in 2018." Balkowitsch Aff. [Dkt # 23-1] ¶ 98.

Annually, Tomaz was entitled to three weeks (120 hours) of vacation time and one week (40 hours) of sick time, for a total of 160 hours. Pl.'s Resp. to Defs.' SMF [Dkt # 25] ¶ 76. Tomaz's paychecks reflect a time "bank" of more than 160 hours for 2018. *See* Exhibit F [Dkt # 23-10] at 15 (paycheck dated 12/14/18 reflects that he had taken 141.231 hours and had a balance of 69.538 unclaimed hours). MAX contends that the amount Tomaz was paid in February of 2019 did not include owed vacation time because Tomaz had used more than his four allotted weeks of vacation and sick time in 2018. *See Tze-Kit Mui v. Massachusetts Port Auth.*, 478 Mass. 710, 713-715 (2018)

(holding that unused non-vacation time does not constitute wages and thereby need not be paid for by the employer).  MAX argues that in 2018, Tomaz took fourteen days of vacation (112 hours) and eight sick days (64 hours), which would be three days or 24 hours more than what he was entitled to take.  Defs.' Opp'n at 6.  Because of the parties' conflicting measurements of Tomaz's time off in hours versus days, and the fact that MAX's records fail to clearly differentiate between sick days and vacation time, this seemingly inconsequential dispute is incapable of being resolved at this juncture (although the burden of accurate timekeeping would seem to appropriately fall to the employer).  Viewing the competing evidence in the light most favorable to each moving party in turn, summary judgment must be denied for both parties on Count II.  *See Knidel v. T.N.Z., Inc.*, 211 F. Supp. 3d 382, 397 (D. Mass. 2016) (denying summary judgment where there were genuine issues of material fact as to how much vacation time plaintiff had earned at the time of his discharge and whether he was fully compensated for any unused vacation time); *Jason v. City of Lowell*, 2012 Mass. App. Div. 185, 185 (Dist. Ct. 2012) (finding plaintiff failed to establish checks constituted "earned wages" under the employer's vacation pay policy despite the undisputed fact that he received his vacation check after the date of discharge).

b.  Count IV

In Count IV, Tomaz alleges that MAX improperly deducted hours from his vacation time instead of his earned sick time when he missed work in September of 2018 because of an injury.  Massachusetts General Laws ch. 149, § 148C guarantees employees earned sick time and makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under or in connection with this section."  *Id.* § 148C(h).  It also explains that

> [e]mployers [who are] required to provide earned paid sick time who provide their employees paid time off under a paid time off, vacation or other paid leave policy who make available an amount of paid time off sufficient to meet the accrual requirements of this section that may be used for the same purposes and under the same conditions as earned paid sick time under this section are not required by this section to provide additional earned paid sick time.

*Id.* § 148C(k).  Because the undisputed portion of the records show that Tomaz took eight days off to recover from an injury in September of 2018 and was paid for those days, Tomaz Dep. [Dkt # 27-4] at 151, his motion for summary judgment on Count IV will be denied.  MAX's cross-motion for summary judgment on Count IV will be allowed to the extent that it is undisputed that Tomaz was paid for all of the earned sick time to which he was entitled in 2018 whether his vacation time was accurately calculated or not.

## II.   Defendants' Motion on Counts I and III

MAX contends that Tomaz's claims to overtime pay (Counts I and III) fail under the executive exemption set out in Massachusetts and federal law. *See* 29 U.S.C. § 213(a)(1); Mass. Gen. Laws ch. 151, § 1A; Defs.' Mem. [Dkt # 24] at 1.   The Massachusetts state and federal courts recognize that the overtime provisions of the state and federal wage laws are "nearly identical," *Cash v. Cycle Craft Co.*, 508 F.3d 680, 686 (1st Cir. 2007), quoting *Goodrow v. Lane Bryant, Inc.*, 432 Mass. 165, 171 (2000).   Accordingly, I will focus on the more fulsomely litigated federal exemption.   *See Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999); *see also Swift v. AutoZone, Inc.,* 441 Mass. 443, 447 (2004).

The executive exemption applies to any employee:

(1)   Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week[2] . . . exclusive of board, lodging or other facilities;

(2)   Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

---

[2] In January of 2020, the amount of weekly salary required pursuant to 29 CFR § 541.600 to qualify as an exempt executive was $684 per week. From March of 2016 until early August of 2016, Tomaz earned $1,346.15 per week, and by August 14, 2016 earned $2,692.30 per week (the relevant time period).   *See Def.s' Statement of Undisputed Facts ¶¶ 17-18.* Neither party contends that Tomaz ever earned less than the minimum amount required under the regulation.

(3)     Who customarily and regularly directs the work of two or more other employees; and

(4)     Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.  All four requirements must be met for the exemption to apply.  *Marzuq v. Cadete Enters., Inc.*, 807 F.3d 431, 435 (1st Cir. 2015).  The employer bears the burden of proving the exemption.  *Cash*, 508 F.3d at 683. "'[T]he remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them.'"  *Marzuq*, 807 F.3d at 438, quoting *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 7 (1st Cir. 1997).  The court will examine each of the four requirements in turn.

*Compensated on a Salary Basis Not Less Than $684 per Week*

An employee is paid on a "salary basis," "if the employee regularly receives each pay  period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602.  The Department of Labor "has unequivocally and consistently declared that additional compensation in the form of hourly overtime payment does not defeat exempt status under the salary-basis test."  *Boykin v. Boeing Co.*, 128 F.3d

1279, 1281 (9th Cir. 1997). "An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount on a salary basis." 29 C.F.R. § 541.604(a). *See O'Brien v. Town of Agawam*, 350 F.3d 279, 293 (1st Cir. 2003) (immaterial that supervisory officers received varying amounts of overtime payments in addition to their salary where it was undisputed that they received "a predetermined amount constituting all *or part* of [their] compensation" on a weekly basis) (emphasis in original), citing 29 C.F.R. § 541.118(a)).

Tomaz started at MAX with an annualized salary of $60,000 per year, which was increased five months later (on August 14, 2016) to $70,000 per year. Balkowitsch Aff. ¶¶ 14-15. Tomaz does not dispute that his weekly earnings never fell below the minimum amount required by 29 C.F.R. § 541.100, and was not subject to any reduction based on the quality or quantity of his work. *Id.* ¶¶ 17-19, 21. That Tomaz was paid an additional $35.00 per hour for working off-site events, was permitted to keep tips from customers, and was reimbursed for mileage, hotel stays, and meals has no bearing on his status as an exempt employee. *See O'Brien*, 350 F.3d at 293. The first requirement of the exemption is therefore satisfied.

*Primary Duty is Management of the Enterprise or of a Customarily Recognized Department or Subdivision*

"Management" includes but is not limited to,

activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; . . . providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Mullins v. City of New York*, 653 F.3d 104, 107 (2d Cir. 2011), quoting 29 C.F.R. § 541.102; *see also Donovan v. Burger King Corp.*, 672 F.2d 221, 223 (1st Cir. 1982) (finding employee engaged in management where he assigned work, oversaw product quality, trained employees, and determined the quantity of food to be produced, even where many of these tasks were governed by highly detailed instructions in a manual and he also took orders and prepared food).

As the Head Chef at off-site catered events, Tomaz instructed sous chefs on the preparation and presentation of the menu, and specified the items of kitchen equipment to be used.  Tomaz Dep. at 86-87.  He was also responsible for alerting kitchen workers to client food allergies, *id.,* for

11

insuring quality control, *id.* at 42, 43, and for policing the food safety and sanitary practices of the crew. *Id.* at 40.

While these are not inconsiderable responsibilities, MAX's former Managing Director Phillip Corona testified that "[n]o aspect of managing the event or the employees at the event ever fell upon its 'Head Chef.'" Corona Aff. ¶ 9. And while Tomaz often acted as a spokesman for kitchen workers who had issues with MAX management about their wages and hours, Corona attributed this quasi-managerial role to Tomaz's superior English language skills. *Id.* ¶ 8. On balance, therefore, there is a material dispute of fact as to whether Tomaz could be deemed a "manager."

Whether management was Tomaz's "primary" duty is also a matter of dispute. 29 C.F.R. § 541.700 states that

> an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.

29 C.F.R. § 541.700(a). Relevant factors to consider when making this determination include: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the

wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*  The court will examine each of these in turn.

### (1) Relative importance of the exempt duties as compared with other types of duties

MAX asserts that its principal line of business is the catering of events, and because the Head Chef is ultimately responsible for the quality and presentation of the food, performing that role was Tomaz's primary duty. Balkowitsch Aff. ¶¶ 34-35, 46.  Tomaz, however, notes that MAX also prepared food for take-out and delivery to customers, and insists that his primary duty "was to assist in the preparation of food at the Commissary." Tomaz Aff. ¶ 2.  In a case with similar facts, the district court in *Scherer v. Compass Grp. USA, Inc.* noted,

> this responsibility for planning menus, overseeing the amount and manner of food production, maintaining appropriate food supplies, overseeing staff performance and productivity . . . was of far greater importance than his responsibility for assisting with food preparation. The relevant importance of plaintiff's managerial duties over his performance of the same food preparation tasks as other kitchen staff is confirmed by his salary, which was nearly twice that of the other kitchen employees.

340 F. Supp. 2d 942, 953 (W.D. Wis. 2004).  However, Tomaz counters that while his responsibility as Head Chef was to pack the food for the event, oversee its preparation, and repack any leftovers, the hands-on supervision of employees at off-site events fell to senior MAX managers.  Tomaz Aff. ¶ 5.

### (2)     Amount of time spent performing exempt work

Although 29 C.F.R. § 541.700(b),  notes that the time spent on exempt versus nonexempt work is a helpful indicator of an employee's primary duty, "nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work" if the other factors weigh in favor of exemption.

> [F]or example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

*Id.* § 541.700(c).  The fifty percent standard is even less appropriate when managerial tasks cannot "readily and economically be separated from the nonexempt tasks."  *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1114 (9th Cir. 2001).  One in charge "may have management as his primary duty 'even though he spends the majority of his time on non-exempt work and makes few significant decisions.'"  *Marzuq*, 807 F.3d at 437, quoting *Burger King Corp.*, 672 F.2d at 227.

Since Tomaz's duties, as described, included preparing food and supervising kitchen helpers, tasks that might be characterized as managerial,

these tasks cannot be readily separated from his ordinary workday duties. *See Baldwin*, 266 F.3d at 1114.  Thus, the statistic recited by MAX showing Tomaz working as Head Chef at over 86 percent of the of the off-site events to which he was assigned, *see* Exhibit C [Dkt 23-7], is not particularly meaningful.

The parties note that, in 2018, Tomaz spent a significant amount of time assisting with construction and maintenance work at MAX's Commissary.  MAX portrays Tomaz's role as that of a construction foreman, s*ee* Defs.' Mem. at 12, while Tomaz testifies that he was a mere grunt, painting and doing maintenance under the direction of the general contractor.  Tomaz Aff. ¶ 6.  Because as a rule, "[t]he question of how [employees] spen[d] their working time . . . is a question of fact," *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986), the debate over how to divide Tomaz's work time is of little help in resolving the issue on summary judgment.

(3)    *Relative freedom from direct supervision*

It is undisputed that Tomaz had keys to the mail room, liquor room, and the recycle oil bin at the Commissary, all of which he could access freely and without prior permission.   *See* Pl.'s Response to Defs.' SMF ¶ 47. *Compare Goodrow*, 432 Mass. at 167 (employee did not fall within executive

exemption where her pocketbook and bags were checked by another employee whenever she left the store) *with Scherer*, 340 F. Supp. 2d at 954 (employee was exempt where he had key to the building, an individual phone line, and a personal email account).   Tomaz also had a company credit card and, during 2017 and 2018, he spent $28,140.35 and $93,602.38, respectively, on the card.  Pl.'s Response to Defs.' SMF ¶ 48.  On balance, this factor weighs in favor of MAX's exempt employee argument.

   *(4)  Relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee*

   "If, on an hourly basis, a manager's salary for performing a high percentage of nonexempt work is about the same as the wages of crew members for such work, the justification for exempting the manager from overtime pay is weakened."  *Marzuk*, 807 F.3d at 444; *see also Burger King Corp.*, 675 F.2d at 520 ("Where salary is low and a substantial amount of time is spent on nonexempt work, the inference that the employee is not an executive is quite strong . . . ."); *Marshall v. W. Union Tel. Co.,* 621 F.2d 1246, 1251 (3d Cir. 1980) (noting that "granting managerial employees exempt status must have been a recognition that they are seldom the victims of substandard working conditions and low wages.").   Tomaz earned $35.00 per hour in addition to his salary when working off-site events, while the

lesser chefs and cooks who worked under him typically made $17.00 to $26.00 an hour for event work and $12.00 to $25.00 an hour for prep work at the Commissary.  Balkowitsch Aff. ¶ 16; *see, e.g.*, Cooper Aff. [Dkt # 23-4] ¶ 5.  Most employees received two weeks of paid vacation, while Tomaz was given three weeks.  *Id.* ¶¶ 93-94.  From the vantage of relative compensation, again the balance weighs in favor of MAX.

### *Customarily Recognized Department or Subdivision*

The final factor making up the second prong of the executive exemption test is whether the employee managed "a customarily recognized" subdivision of the enterprise.  29 C.F.R. § 541.103 explains that "'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a).

Tomaz, in his role as the Executive Sous Chef or Head, had charge of the kitchen, known as the "back of the house."  *See* Tomaz Dep. at 41 ("The head chef at the events, he's the head of the back of the house.").  The "back of the house" was recognized by the staff as a unit separate from the "front of the house," which was overseen by the client-service manager.  *See* Balkowitsch Aff. ¶ 32; Cooper Aff. ¶¶ 27-29; *see also Scherer*, 340 F. Supp.

2d at 951  (finding evidence that immediate supervision of the front of the house and immediate supervision of the kitchen and food production were conducted by different persons "sufficient to distinguish the kitchen from a 'mere collection of men assigned from time to time to a specific job or series of jobs.'");  *Cobb v. Finest Foods, Inc.*, 755 F.2d 1148, 1150 (5th Cir. 1985) (finding that the hot foods section of the various cafeteria operations where Cobb worked were recognized departments or subdivisions of the overall enterprise).  This factor also favors MAX.

*Customarily and Regularly Directs the Work of Two or More Other Employees*

The third requirement under the executive exemption is that the employee customarily and regularly directs the work of two or more other employees.  29 C.F.R. § 541.100; *Marzuq*, 807 F.3d at 435.  "'[C]ustomarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. § 541.701; *see Rooney*, 577 F. Supp. 2d at  526 (officer customarily and regularly directed the work of employees where he "ma[de] judgment calls regarding work that subordinates [we]re to perform, exercise[d] discretion in directing the work of subordinate employees, supervise[d] employees under him, and ha[d] the authority to order in additional police personnel to work.").

Tomaz does not dispute that as the Head Chef he was responsible for the kitchen.  *See* Tomaz Dep. at 38; *see also* Balkowitsch Aff. ¶ 33 ("[T]he Head Chef would be in charge of the Kitchen during the event and all of the employees in the Kitchen . . . .").  As previously noted, the Head Chef directed chefs on how to cook the food, what equipment to use, how to plate the food, and how to pack the food before and after a catered event.  Tomaz Dep. at 32, 35; *see* Cooper Aff. ¶ 23 ("As Head Chef at MAX's events, Mr. Tomaz would . . . assign various roles to chefs; direct chefs in setting up the kitchen, tables, and ovens . . . direct chefs in cooking, finalizing, and preparing the food . . . .").  If a kitchen worker failed to practice food safety or prepare a dish properly, Tomaz would correct that cook and have the item re-done.  Tomaz Dep. at 40.   The parties dispute whether Tomaz "supervised" these employees in the strict sense of the term, but MAX's Employee Rosters [Dkt # 23-8] evidence that while Tomaz was serving as Head Chef, there would frequently be at least a handful of other (non-head) chefs working in the kitchen with him.  Even outside of events, former employee Jon-Paul Cooper noted that "[a]t any given time, there were approximately five (5) to (10) prep cooks on the [hors d'oeuvre] team who Mr. Tomaz managed and directed." Cooper Aff. ¶ 13.  Further, "Mr. Tomaz customarily and regularly drafted, created, and implemented the work schedule for his [hors d'oeuvre] team,

which entailed him determining the amount of chefs and cooks needed at the commissary and identifying which chefs were necessary for production and preparation during the week." *Id.* ¶ 16.  It does appear that some of MAX's chefs and cooks viewed Tomaz as their supervisor when he was Head Chef, while some did not.  *Compare* Cooper Aff. ¶ 25 ("I viewed Mr. Tomaz as my supervisor at events when he was Head Chef.") *with* Pelligrini Aff. ¶ 3 ("He was never in charge of employees.").  Again on balance, advantage MAX.

   *Authority to Hire and Fire*

   Finally,  to  show  that  Tomaz  is  an  exempt  employee,  MAX  must demonstrate that there is no genuine dispute as to whether Tomaz had the authority  to  hire  or  fire  other  employees  or  that  his  suggestions  and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.  *See* 29 C.F.R. § 541.100.  "To determine whether an employee's suggestions and recommendations  are  given  'particular  weight,'  factors  to  be  considered include, but are not limited to . . . the frequency with which such suggestions and recommendations are made or requested[] and the frequency with which the  employee's  suggestions  and  recommendations  are  relied  upon."    29 C.F.R. § 541.105; *see also Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 904 (8th Cir. 2014) (noting that "many different employee duties and

levels of involvement can work to satisfy this fourth element," including "the offering of personnel recommendations that were acted upon by managers, involvement in screening applicants for interviews, and participation in interviews . . . .").

MAX contends that Tomaz's personnel suggestions were given special weight and carried more influence than those of lower-level hourly employees. *See* Balkowitsch Aff. ¶¶ 58 , 63. Corona, however, testified that "[e]ven if Mr. Tomaz made a suggestion to hire an employee, it was not given any more weight than any other employee that might recommend a new hire." Corona Aff. ¶ 7.[3] A former MAX employee, Tiago Uzai similarly testified that "Max is always looking for employees and constantly asked all employees if they have anyone that might want to work for Max." Uzai Aff. ¶ 5.

The parties agree that MAX's business is somewhat unique in that event workers were very rarely "fired," but rather were not invited back to work at another event. Defs.' SMF ¶ 62. While Tomaz did not have a role in "firing," MAX argues that management frequently selected staff from among those who Tomaz recommended. Balkowitsch Aff. ¶ 59. Tomaz testified that

---

[3] Corona served as managing director of MAX until August 2016, and it is possible that Tomaz's duties or the weight of his recommendations took on more heft in the new administration.

he recommended hiring staff for large events, especially those with whom he had worked before, and staff for busy seasons, and would periodically ask workers if they had friends who wanted to work an event.  Tomaz Dep. at 47, 51; *compare Madden*, 745 F.3d at 907 (element not satisfied where employer could not recall employee providing a single personal recommendation). Tomaz also admitted to bringing on certain employees and feeling bad "to have people that we introduced to have them working, and they are not happy."  Tomaz Dep. at 70.   Given the dispute over Tomaz's role in hiring and "firing" at MAX, there is no basis on which summary judgment could be allowed with respect to this fourth requirement.

*Conclusion*

While MAX has made out a colorable case that Tomaz was an exempt employee (particularly given the compensation differential between Tomaz and the line employees who worked under him), to qualify for the exemption as a matter of law, the employer is required to meet all of the four requirements of the FSLA.  Because material disputes of fact exist as to aspects of the first requirement and the fourth, MAX's motion for summary judgment on Counts I and III must be denied.

<u>ORDER</u>

For the foregoing reasons, Tomaz's motion for summary judgment is <u>DENIED</u> as to Counts II and IV.  MAX's cross-motion for summary judgment is <u>DENIED</u> as to Counts I, II, and III, and <u>ALLOWED</u> as to Count IV.  The Clerk will enter judgment accordingly and set the case for trial.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE

23